UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 24 CR 503 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| EDMUND SINGLETON | ) | District Judge |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On November 3, 2022, defendant Edmund Singleton and his co-defendants carjacked two innocent Chicagoans at gunpoint. Each crime was violent and reckless. In the first carjacking, defendant's co-defendant jammed his gun so hard into his victim's back that he left a bruise. In the second carjacking, defendant targeted a vulnerable victim, a doctor at Northwestern who had polio as a child, pinning him in with the getaway car so his co-defendants could force him to the ground and take his keys. Defendant committed this violent crime while on federal supervised release for another gun conviction.

Defendant refused to accept any responsibility for his crimes. Not only did he go to trial, but, as his trial approached, defendant orchestrated a false affidavit from his co-defendant Marquell Davis in which Davis provided a false alibi for defendant. Defendant paid Davis in return for this false affidavit and jail calls show that he believed the false affidavit would allow him to escape liability.

Unlike his co-defendants, defendant is not a young man and his violent crimes in this case and obstruction of justice are the culmination of a lengthy and violent criminal history. Defendant's prior prison sentences and his federal supervision failed

to deter him, and now, innocent Chicagoans have been traumatized. No sentence will repair the pain defendant has inflicted upon his victims, but a significant sentence is necessary to ensure that he never harms someone again. The government recommends a sentence of 312 months, which is within the Guidelines range. The government recognizes this is a significant sentence, but given defendant's violence, his dangerousness, and his brazen attempts to subvert the judicial process, this sentence is warranted.

## I. BACKGROUND

On October 24, 2024, defendant was charged in an indictment with conspiracy to commit a carjacking and armed robbery, in violation of Title 18, United States Code, Section 371 (Count One); carjacking and attempted carjacking, in violation of Title 18, United States Code, Section 2119 (Counts Two and Four); using a gun in furtherance of a crime of violence, in violation of Title 18, United States Code, Section 924(c) (Count Three); and felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count Five). Dkt. 16. Defendant was convicted of all counts of the indictment on July 28, 2025, after a week-long jury trial. Defendant is scheduled to be sentenced by this Court on January 8, 2026.

## II. ADVISORY GUIDELINES CALCULATION

Count Three requires a mandatory minimum sentence of 7 years because defendant's co-conspirators brandished a firearm during the carjacking they committed.

As to the remaining counts, the Probation Office has calculated defendant's offense level as 35, based upon the two carjackings, and enhancements for committing

2

a carjacking, obstructing justice, reckless endangerment during flight, attacking a vulnerable victim, and inflicting injury upon one of his victims. PSR at ¶¶ 11-58. The government agrees with the Probation Office's offense level calculation.

As the Court has already held during the sentencings of defendant's co-defendants, the facts of their crime support the enhancements. Defendant and his co-defendants fled from police, at times at high speed, in the Jeep SRT used to commit the carjackings with defendant driving evasively. They then fled on foot with guns and hid in residential backyards as police encircled them. As shown on the helicopter video at trial, defendant ran from police and discarded his gun next to a residential driveway as police closed in. Based on these facts, the reckless endangerment enhancement under § 3C1.2 applies. *See United States v. Chandler*, 12 F.3d 1427, 1433 (7th Cir. 1994) (upholding enhancement where defendant led officers on high-speed chase); *United States v. Rogers*, 423 F. App'x 636, 640 (7th Cir. 2011) (defendant "discarded a loaded revolver in a residential neighborhood at night, creating a substantial risk that someone would find it and get hurt. Thus, it would be frivolous to challenge the § 3C1.2 adjustment.").

The vulnerable victim enhancement is also appropriate because, as demonstrated through surveillance video at trial, during the second carjacking, defendant, who was driving, paused for at least 40 seconds in the Jeep SRT in a good position to observe their victim slowly exit his vehicle using crutches. Defendant then circled back and pinned the doctor in with the SRT, so his co-defendants could complete the carjacking. As the Court was able to observe at trial, Victim B's history

of polio and use of crutches made him more vulnerable to attack such that the enhancement is warranted. *See United States v. White*, 903 F.2d 457, 463 (7th Cir. 1990) (applying enhancement to armed robbery victim in his 60's with respiratory problems because it was logical that defendant targeted victim "having observed his advance age" that "rendered him unable to resist and flee").

The obstruction of justice enhancement is also appropriate. Shortly before trial, defendant orchestrated a scheme in which his co-defendant Marquell Davis authored a false affidavit in which he claimed that defendant was not with him during the carjackings. Jail calls and emails show that defendant arranged for the affidavit, that his girlfriend paid Davis $50 in return for the false affidavit, and that defendant believed the false testimony would lead to a not guilty verdict or dismissal. At trial, call records, cell tower evidence, and DNA proved that Singleton was driving the Jeep SRT when the carjackings were committed and that the affidavit was false. *See United States v. Gonzalez-Mendoza*, 584 F.3d 726, 730 (7th Cir. 2009) (upholding obstruction enhancement where defendant committed perjury in false affidavit).

The government agrees with the Probation Office's determination that defendant has a criminal history category of III. PSR ¶ 147. As a result, defendant has a final offense level of 35, resulting in a sentencing guideline range of 294 to 346 months' incarceration, which includes the mandatory 84 months pursuant to Count Three. PSR ¶ 148. The Probation Office has recommended a sentence of 240 months.

### III. THE 3553(A) FACTORS WARRANT A SIGNIFICANT SENTENCE WITHIN THE GUIDELINES RANGE

The Sentencing Guidelines provide an initial benchmark for sentencing. *Gall*

4

*v. United States*, 552 U.S. 38, 49-50 (2007). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. The Guidelines thus "remain an essential tool in creating a fair and uniform sentencing regime across the country." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005); *see also United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) (a "district court that sentences within the Guidelines necessarily gives weight and consideration to avoiding unwarranted disparities."). The ultimate goals of the Guidelines are "uniformity and proportionality." *Rita v. United States*, 551 U.S. 338, 349 (2007). Although a sentence within the Guidelines is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in 18 U.S.C. § 3553(a).

Here, the Guidelines range is high, but they are an appropriate reflection of defendant's violent and lengthy criminal history, his serious crime, and his brazen attempt to undermine the trial by fabricating a false affidavit. A significant sentence of 312 months is warranted to protect society and deter defendant and others from committing similar offenses.

### A. The Nature and Circumstances of the Offense

On November 3, 2022, defendant and his co-defendants made a plan to carjack and rob at gunpoint innocent people throughout Chicago. Evidence presented at trial shows that defendant took a leadership role in preparing to commit the carjackings. First, he acquired the necessary materials to commit the carjacking. Search history

5

records from defendant's phones showed that he ordered the gun accessories and masks that defendants used in the carjackings. Defendants also acquired the stolen Jeep SRT that would serve as the getaway car for the carjackings. At trial, the government presented messages from defendant's phones in which he referred to the SRT as "my SRT" and made efforts to acquire the SRT in the weeks before the carjackings. Then, defendant hunted for victims. Defendant was driving SRT during the carjackings, and he strategically drove near gas stations searching for cars he liked and unsuspecting victims. When he identified a target, defendant used the SRT to pin his victims in and then his co-defendants burst out of the SRT with guns drawn, made threats, and quickly attempted to steal the victims' cars.

The first victim defendant chose was Victim A. Victim A was pumping gas on the south side of Chicago, minding his own business. As shown on surveillance and through Victim A's testimony at trial, defendant slowed the Jeep SRT near the victim, observed him pumping gas in front of his Infiniti, and circled back to commit the carjacking. Defendant pinned Victim A in, and then while defendant looked on, his co-defendant, Davis, quickly ran up to Victim A and jammed a snakeskin gun into Victim A's back. Victim A testified at trial that force of the gun was so great that it left bruising. Below is a screenshot of Davis pressing the gun into Victim A's back:



Davis then forced Victim A to the ground at gunpoint and took his car keys. Victim A scrambled away on the ground in terror. Victim A testified that he was afraid that the carjackers were going to shoot him in the face and told Probation that the whole experience was "traumatizing." As he stood up to get further away, Davis pointed his gun at Victim A, causing Victim A to jump in fear. Defendant stood by in the SRT, protected from surveillance cameras but watching these violent acts and ensuring his accomplices completed the carjacking, before they drove off together.

But one carjacking was not enough. A few hours later, defendant and his co-defendants used the SRT to commit another carjacking. This time, they carjacked Victim B, a Northwestern doctor who had polio as a child and who, as a result, walks slowly with crutches. Surveillance video showed the Jeep SRT slowing and pausing for several seconds as Victim B exited his vehicle with crutches. *See* Ex. A. Below is

7

a screenshot of the Jeep SRT paused at an intersection as Victim B exited his vehicle. Defendant was driving the SRT and would have had a clear view of Victim B from the SRT. The SRT paused at the intersection for at least 40 seconds, despite having a green light for a portion of that time. *Id.*



Similar to the first carjacking, defendant then used the SRT to box in his victim. Davis and Bradley then exited the SRT and pointed guns at Victim B as he collapsed to the ground in fear. None of the carjackers aborted the carjacking when they saw that Victim B used crutches. Bradley and Davis tried to drive away in Victim B's BMW and only gave up on the carjacking once they were unable to operate Victim B's specially designed car. At this point, defendant's key role in the carjacking scheme became clear. He waited nearby in the SRT and stood by ready to assist when things went wrong. When they failed to operate Victim B's car, Bradley and Davis quickly got back in the SRT and defendant fled allowing them to escape.

The evidence presented at trial also shows that defendant was not a mere driver. If anything, defendant, who was the oldest member of the carjacking

conspiracy, remained in the car only to protect himself from being captured on surveillance, not because he was any less invested in the carjackings. Defendant had a loaded gun with a round in the chamber, ready for use if he and his co-defendants ran into residence from police officers or an armed victim. Defendant's gun, recovered near his arrest and featured in numerous photos and videos from his phones, was a particularly dangerous gun—a specially outfitted Glock with a foregrip, an extended magazine, and a switch attached that converted it to a machinegun.

Defendant's dangerous behavior did not end with the carjacking of Victim B. Shortly after the carjacking, a police officer spotted the SRT. Defendant fled from that police officer and then led police helicopters on an approximately 20-minute chase, at times traveling at high-speed and using evasive driving techniques. As police officers on the ground closed in, defendants abandoned the SRT and fled on foot while armed with guns. As shown on helicopter and body worn camera footage, and as established at trial, defendants ran through the backyards of residential homes and discarded their guns as police closed in. Defendant discarded his gun next to a driveway in a residential front yard where it easily could have been found by a curious child playing in the yard.

Defendant's crimes were serious, violent, and showed a complete disregard for human life. As horrible as gang shootings or bank robberies are, carjackings are uniquely personal. The victims are all innocent—driving home from work, dropping off a co-worker, getting ready to watch a football game—and their cars were invaded by men with loaded guns threatening to kill them. The victims testified that they

9

feared for their lives and truly believed the carjackers would shoot them if they resisted. And it is not hard to imagine someone getting killed during these reckless crimes. Defendant's gun was loaded with a live round in the chamber. The same is true of the other carjackers' guns. What would have happened had a victim or bystander pulled out a legal gun to defend themselves?

Defendant's punishment must reflect the grave seriousness of his crimes, the trauma he inflicted upon several innocent people, and the danger and violence he caused. A sentence of 312 months, in the Guidelines range, is appropriate given the scope and seriousness of his crimes.

    **B.    Obstruction of Justice**

On July 7, 2025, two weeks before trial, defendant filed a motion seeking to admit a notarized affidavit signed by his co-defendant, Marquell Davis, in which Davis attempted to provide an alibi for Singleton.

After receiving notice of the affidavit, the government obtained jail calls, jail emails, and jail account payment records from the Metropolitan Correctional Center for defendant, which showed that he had instructed his girlfriend to put money in defendant's inmate trust account in exchange for Davis signing the false affidavit. Below is a summary of emails between defendant and his girlfriend Destiny Lyles on June 8 and June 9 (attached as an Exhibit to the government's version of the offense).[1]

- 6/8/2025 (the day before the affidavit was notarized): defendant wrote, "aye

---

[1] At trial, the government introduced a video in which defendant identified Lyles as his girlfriend.

10

wifey could you put 50 on his book's for me please and thank you."
- 6/8/2025: Lyles responded, "if he really gonna do it then yea."
- 6/9/2025: defendant wrote, "I'm waiting on you to send it . . . I told you that he got that shit tooking [sic] care of ass well now we just wait till tomorrow to get the copy's made wifey bae I'm [sic] really think that this shit is gone work out for us."
- 6/9/2025: Lyles responded, "okay well ima send the money in a bit."
- 6/9/2025: defendant wrote, "thanks for sending me the money and lilbro" [In defendant's phone, Davis's phone number was saved with the contact name "Lilbro Smokey."]
- 6/9/2025: defendant wrote, "well we at the end of this shit and it's time to get this shit over with soo your man could get tf outa here frfr"
- 6/9/2025: defendant wrote, "okay thank you and yess tell him that lilbro did his part on the thing and we just gotta wait till tomorrow to make the copy's to it then we good from there stank and yess its about to be over with real soon."
- 6/10/2025: defendant wrote, "now we just gotta see how this shit play out at court but everybody that on are deck that be doing the law work says that we should be super good and they should dismiss the shit on me now fasho."
- 6/11/2025: defendant wrote, "we have this shit all the way beat fasho fasho and he still talking good on that are behave [sic] if he haves to come to court and tell the judge hisself bao soo we gone be good tho I have a real good feeling about this shit gone work out for us bae cause we aint never came this close how we are now with what he did."

On June 9, 2025, the same date the affidavit was notarized and the same date that Singleton wrote "thanks for sending me the money and lilbro," Destiny Lyles sent Davis $50 to his jail account. Below is a screenshot of Davis's payment records from the MCC.

| Date: | 07/17/2025 | | | | | | | | | Location: DC |
|---|---|---|---|---|---|---|---|---|---|---|
| Time: | 05:57 PM | | | Federal Bureau of Prisons | | | | | | |
| | | | | TRUVIEW | | | | | | |
| | | | | Inmate Center Report | | | | | | |
| | | | | Sensitive But Unclassified | | | | | | |
| Reg #: | 44073511 | Start Date: | 6/9/2025 | End Date: 6/16/2025 | | | | | | |
| ☑ Money Received | | ☑ Money Sent | | ☐ Contact List | ☐ Addresses | ☐ Phone List | | ☐ Calls | | |
| ☐ Email List | | ☐ Messages | | ☐ Visitor List | ☐ Visits | ☐ Timeline | | | | |
| **Money Received** | | | | | | | | | | |
| Transaction Date | Loc | Trans Type | Amount | Sender Nm | Address | City | St | Zip | Phone | |
| 6/11/2025 8:06:12 PM | CCC | Money Gram | $40.00 | DAVIS, MAKELA | 7736 S PEORIA ST | CHICAGO | IL | 60620 | 7737389388 | |
| 6/9/2025 6:06:47 PM | CCC | Western Union | $50.00 | LYLES, DESTINY | 7946 S NORMAL | CHICAGO | IL | 60620 | 3129983271 | |

11

Jail calls from June 8 and June 9 between defendant and Lyles also confirm that defendant arranged for Lyles to pay defendant $50 to sign the alibi affidavit for defendant. At trial, the government presented substantial evidence that the alibi affidavit was false, and that defendant was driving the Jeep SRT and had his own phones during the carjackings, including:

- Defendant was arrested running from the Jeep SRT and had two of his phones in his possession when he was arrested.
- Those phones' location data showed they were at the scenes of the carjackings.
- Call records from one of the phones recovered from defendant show that he made outgoing calls and text messages during the carjacking spree, including multiple long calls with Destiny Lyles and multiple calls to Davis (including directly after the first carjacking).
- Singleton's phone had a passcode that needed to be entered to make calls or send messages.
- Singleton's DNA was on the steering wheel of the Jeep SRT.

Defendant's orchestration of a false affidavit not only warrants the enhancement for obstruction, but it also demonstrates his complete lack of respect for the judicial process or the law. Even after his conviction, defendant has refused to accept responsibility, claiming, despite the overwhelming evidence, that he had nothing to do with the carjackings. Simply put, defendant is unrepentant. Nothing about his behavior leading up to trial or following his conviction indicates that he is prepared to be rehabilitated and live a law-abiding life. His obstruction is aggravating.

### C. Defendant's History and Characteristics

Defendant is 35 years old and has lived in the Chicago area for most of his life. PSR ¶¶ 100-105. Defendant was raised in a low-income family, and he lived in a tough neighborhood where he was exposed to gun violence and poverty. PSR ¶¶ 100-03.

Multiple of his family members have been shot, including his mother, his brother, and a close friend. PSR ¶ 103. Defendant himself has also been shot. *Id.* This violence, as well as the death of defendant's father, caused defendant to suffer from nightmares and trauma. PSR ¶ 122. Despite the difficult circumstances of defendant's upbringing, several of his siblings are gainfully employed, working at steel mills and at FedEx. PSR ¶¶ 101-02. Defendant has five children from relationships with three women, and given his incarceration, he has had limited contact with those children, two of whom now live out of state. PSR ¶¶ 105-08. Defendant struggled in school due to learning disabilities and never graduated high school. PSR ¶¶ 132-33.

Defendant's upbringing offers some mitigation. He clearly has been impacted by the violence and poverty that surrounded him as a child. Unfortunately, his criminal history shows that he has repeatedly committed gun and other violent crimes that re-inflicted the trauma he experienced onto others. In 2007, at the age of 16, defendant was convicted of a gun crime and received probation. PSR ¶ 64. Despite being on probation, just a few months later, defendant was convicted of an aggravated battery in which he battered a 40-year-old victim causing permanent vision loss. PSR ¶ 65. Defendant was convicted as an adult and received a sentence of four years' imprisonment, but he appears to have served less than a year for this incredibly violent crime. *Id.* A year after that conviction, defendant was convicted of reckless conduct in relation to a large gang fight. PSR ¶ 66. Then, in 2011, defendant was again convicted for a gun crime after officers recovered a pistol from him during a stop. PSR ¶ 67. Defendant received a 5-year sentence. *Id.* Although this conviction

13

falls within the last fifteen years, defendant did not receive criminal history points because defendant's statute of conviction was later invalidated. *Id.*

Unfortunately, that 5-year sentence did not deter defendant from recidivating. In 2018, defendant was convicted of illegal gun possession in federal court. PSR ¶ 70. Despite his violent criminal history, defendant received a below-Guidelines sentence of 36 months. *Id.* Defendant had a violation while in prison for fighting. *Id.* Defendant was released in March 2021. Only 20 months later, while on federal supervised release, defendant committed the carjackings in this case. And when he was arrested and not charged, he again got arrested in April 2023, while still on federal supervised release, for a gun crime, which is still pending. Defendant's choice to commit violent crimes while on supervised released weighs strongly in favor of a significant sentence. Minimal prison sentences and court supervision are simply not sufficient to ensure defendant does not continue to harm the public.

But beyond his arrests and convictions, pictures and videos recovered through search warrants and from social media show that defendant was consistently carrying guns in the weeks before and after he committed these carjackings. Below are screenshots from an October 25, 2025, video shown at trial of defendant and co-defendant Davis, with defendant driving the stolen SRT used in the carjackings and Davis holding the gun he used in the carjackings.





Below is a screenshot from a music video released on January 27, 2023, 2 months after the carjackings, in which defendant raps in front of a table filled with guns. *See* "Mr. Biggs" *available at https://www.youtube.com/watch?v=KQXEIAV-Z9Y&list=RDKQXEIAV-Z9Y&start_radio=1.*



15

Below are screenshots from a music video released on April 6, 2023, 6 months after the carjackings and a week before his pending gun case arrest, in which defendant again brandishes a gun. *See* "Get Active" *available at* https://www.youtube.com/watch?v=34ZU_hvBlUw.

 

As the Court heard at trial, defendant glorified guns and violent crime in his song lyrics, bragging about using guns with switches and getting in high-speed chases. Unfortunately, as evidenced by his criminal conduct in this case and his criminal history, the guns in those videos were not mere props and the lyrics were not mere artistic license. For defendant, using and carrying guns with machinegun switches, getting in high-speed chases, and committing crimes that harm innocent people was a way of life.

Defendant's difficult upbringing and exposure to violent crime does offer some mitigation. It weighs in favor of a sentence toward the bottom of the Guidelines range.

16

But it does not warrant a downward departure from the Guidelines range. Defendant has repeatedly chosen to re-inflict the trauma he experienced on others by committing violent crimes. And he has done so despite previous prison sentences and despite being on court supervision, including federal supervised release.

### D. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment and Deterrence

Defendant's crimes terrorized innocent Chicagoans and showed a complete disregard for human life, for societal norms, and for the law. A significant sentence within the Guidelines range will appropriately punish him for the harm he has caused, it will provide some measure of justice for those he victimized, it will protect society of future crimes, and it will deter him from continuing to offend.

General deterrence is also a factor in this case. While the murder rate in Chicago has declined in recent years, carjackings, many committed by unrepentant carjackers like defendant, spiked around the time he committed this crime, doubling from 2018 to 2023.[2] These violent carjackings are committed by a relatively small number of people, but they have a huge impact on the citizens of the Northern District as a whole. As reflected by the victim testimony, these crimes cause significant trauma, and they are uniquely personal. Carjackings like those here not only leave the victims scarred and perhaps looking for new places to live, but they impact the sense of safety and security for all Chicagoans. Only a significant Guidelines sentence

---

[2] *See* Illinois Policy Institute, *Carjackings More Than Double from 5 Years Ago*, December 5, 2023, *available at* https://www.illinoispolicy.org/carjackings-more-than-double-in-chicago-from-5-years-ago/.

will deter defendant and others like him who would terrorize innocent Chicagoans without remorse.

## IV. RECOMMENDED CONDITIONS OF SUPERVISED RELEASE

Given the circumstances of the offense and all the factors set forth in Title 18, United States Code, Section 3553(a), the government recommends that the Court impose a period of supervised release of five years. Defendant should be supervised for a significant period of time to ensure his continued compliance with the law.

The mandatory, discretionary, and special conditions of supervised release under 18 U.S.C. § 3583(d) are set forth on pages 30 through 36 of the PSR. The government agrees with the conditions proposed in the PSR and concurs with the probation officer's rationale for these conditions. Specifically, the government agrees that discretionary conditions (4), (6), (8), and special condition (3) promote the statutory factors of affording adequate deterrence to criminal conduct, protecting the public from further crimes by the defendant, and assisting the defendant in reintegrating into society upon his release. Providing defendant with adequate educational and job training will help him achieve employment, which will be crucial in helping prevent recidivism. The government further agrees that discretionary conditions (7), (9), (14), (15), (16), (17), and (18) and special condition (3), (10), and (11) promote the statutory factor of allowing for effective monitoring of defendant during any supervised release term imposed. Discretionary condition (24) is also appropriate in this case to ensure that defendant is not illegally possessing firearms after he is released.

## V. CONCLUSION

For the reasons set forth above, the government respectfully requests that this Court impose a total sentence of 312 months' imprisonment. Defendant has had many second chances, even after committing violent crimes. Yet, he has continued to harm people. Then, before trial, he brazenly tried to subvert the justice system by orchestrating false testimony. His conduct, both during the offenses and before trial, warrants a significant sentence that will deter him from ever harming someone again.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: *s/ Elie Zenner*
ELIE ZENNER
SIMAR KHERA
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 697-4032